## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA *ex rel.*
SANDRA GAUCH and MICHELLE
MCNEILL;

STATE OF ALASKA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF CALIFORNIA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF COLORADO *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF CONNECTICUT *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

DISTRICT OF COLUMBIA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF DELAWARE *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF FLORIDA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF GEORGIA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF HAWAII *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF ILLINOIS *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF INDIANA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF IOWA *ex rel.* SANDRA GAUCH
and MICHELLE MCNEILL;

STATE OF LOUISIANA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

**CIVIL ACTION No. _____**

**FILED UNDER SEAL
PURSUANT TO
31 U.S.C. § 3730(b)**

**JURY TRIAL REQUESTED**

STATE OF MARYLAND *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF MASSACHUSETTS *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF MICHIGAN *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF MINNESOTA *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF MONTANA *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF NEVADA *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF NEW JERSEY *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF NEW MEXICO *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF NEW YORK *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF NORTH CAROLINA *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF OKLAHOMA *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF RHODE ISLAND *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF TENNESSEE *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF TEXAS *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF VERMONT *ex rel.* SANDRA GAUCH and MICHELLE MCNEILL;

STATE OF VIRGINIA *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

STATE OF WASHINGTON *ex rel.* SANDRA
GAUCH and MICHELLE MCNEILL;

        Plaintiffs,

    v.

Lincare Holdings Inc.; Alpha Respiratory Inc.;
Gamma Acquisition Inc.; Health Care Solutions
at Home Inc.; HomeCare Equipment Network
Inc.; Lincare Inc.; Lincare Licensing Inc.;
Lincare Pharmacy Services Inc.; Lincare
Procurement Inc.; Med 4 Home Inc.; Lincare of
Canada Acquisition Inc.; Caring Responders
LLC; HCS Lancaster LLC; Lincare Equipment
LLC; Lincare Leasing LLC; mdINR, LLC;
Medimatics LLC; PulmoRehab LLC; Lincare
Pulmonary Rehab Management, LLC;
Community Pharmacy Services, LLC; Acro
Healthcare, LLC; Lincare Online LLC; Lincare
Pulmonary Rehab Services of Florida, P.L.;
Optigen, Inc.; MRB Acquisition Corp.;
ConvaCare Services Inc.; Sleepcair, Inc.;
Spectrum Medical Equipment Inc.; Healthlink
Medical Equipment LLC; MMOC, LLC; W&F
High Tech Systems, LLC; OCT Pharmacy,
LLC; Complete Infusion Services, LLC; Lincare
Pulmonary Rehab Services of Missouri, LLC;
Lincare of New York Inc.; Valley Medical
Corporation; Acro Pharmaceutical Services
LLC; American HomePatient, Inc.,

        Defendants.

## ORIGINAL COMPLAINT

    1.    This is a False Claims Act case. Defendants are Lincare Holdings Inc., and the

U.S. entities it owns and controls (together, "Lincare"). Lincare knowingly bills Medicare and

Medicaid for expensive Non-Invasive Home Ventilators ("NHVs") that are not actually used by

Lincare's patients. Because the ventilators are not actually used, government payment guidelines forbid reimbursement for the NHVs, and Lincare knows it. Lincare's claims for reimbursement are false and Lincare knows them to be false.

## JURISDICTION AND VENUE

2.     All Counts of this Complaint are civil actions by Relators, acting on behalf of and in the name of the United States and the state plaintiffs, against Lincare under the federal False Claims Act, 31 U.S.C. §§ 3729-3733, and analogous state false claims laws.

3.     This Court has jurisdiction over the claims brought on behalf of the United States pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. § 3732(a).

4.     This Court has jurisdiction over the state law claims alleged herein under 31 U.S.C. § 3732(b). In addition, the Court has supplemental jurisdiction over the claims brought on behalf of the state plaintiffs under 28 U.S.C. § 1367.

5.     The False Claims Act provides that an action under 31 U.S.C. § 3730 may be brought "in any judicial district in which . . . any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." 31 U.S.C. § 3732(a). The Defendants all transact business in this judicial district by, among other things, setting up NHV machines for customers residing in this judicial district. Moreover, Lincare owns and operates a branch office in Elmsford, NY. Accordingly, this Court has personal jurisdiction over the Defendants, and venue is appropriate in this district. 31 U.S.C. § 3732(a). Venue is also proper under 28 U.S.C. § 1391.

6.     None of the allegations set forth in this Complaint is based on a public disclosure of allegations or transactions in a criminal, civil or administrative hearing, in a congressional, administrative or General Accounting Office report, hearing, audit or investigation, or from the

news media. Relators have direct and independent knowledge of the information on which the allegations set forth in this Complaint are based. Moreover, prior to filing this lawsuit and prior to any public disclosures regarding this matter, Relators voluntarily provided the information set forth herein to agents of the United States Department of Justice. Relators will also promptly serve copies of this complaint on the Attorneys General of the state plaintiffs as required by the state *qui tam* statutes.

7.     None of the allegations or transactions set forth in this Complaint is substantially the same as allegations or transactions that have been publicly disclosed in a Federal criminal, civil or administrative hearing in which the Government or its agent is a party, or in a congressional, administrative or Government Accountability Office, or other Federal report, hearing, audit or investigation, or from the news media.

## THE PARTIES

### *Relators*

8.     Relator Sandra Gauch has been employed by Lincare since 2005 as a Sales Representative and/or Patient Care Representative at Lincare's Belleville, IL branch office.

9.     Relator Michelle McNeill was employed by Lincare as a Respiratory Therapist from approximately 2011 to 2015, in Lincare's Centennial, CO, Denver, CO, and North Denver, CO branch offices. Prior to 2011, Relator McNeill was employed by Med4Home, a Lincare subsidiary, as a Sales Representative and/or a Respiratory Therapist, in Med4Home's Lakewood, CO office.

### *Plaintiff United States Of America*

10.     Relators bring this action on behalf of the United States pursuant to the qui tam provisions of the federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

11.     On behalf of the United States, Relators seek recovery for damages to federally funded health insurance programs, including, but not limited to, the federal-state Medicaid drug benefit program, established under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, and state laws; the Medicare Part B program; the Federal Employees Health Benefits Plan ("FEHBP"), established under Chapter 89 of Title 5 of the U.S. Code, 5 U.S.C. §§ 8901 through 8914; and the U.S. Department of Defense TRICARE and CHAMPUS health care programs, established pursuant to 10 U.S.C. § 1071 *et seq.*

12.     The Centers for Medicare and Medicaid Services ("CMS") of the U.S. Department of Health & Human Services ("HHS") funds and oversees the joint federal-state funded Medicaid Program for the financially needy. The state plaintiffs participate in the Medicaid program, under which they pay for durable medical equipment ("DME") in certain circumstances and for certain indigent individuals who are beneficiaries of such programs. Reimbursement for DME covered by a state Medicaid program is made by each state's Medicaid program agency, which, in turn, seeks reimbursement for a portion of its expenditures from the federal government.

13.     CMS funds and oversees the Medicare Part B program, which covers a portion of DME for eligible individuals. CMS funds and oversees this program through contracts with Durable Medical Equipment Administrative Contractors ("DMACs"). The DMACs administer the Medicare Durable Medical Equipment program for Medicare Part B. The DMACs evaluate and process claims for payment from suppliers like Lincare, and issue the payments. (The DMACs are then separately reimbursed by CMS.) The DMACs have authority to conduct audits and issue binding guidance regarding what documentation is required in order to submit a claim for reimbursement. Some of the DMACs' guidance is in the form of Local Coverage

Determinations ("LCDs"). Making a false claim to a DMAC is equivalent, for purposes of the FCA, to making the false statement directly to CMS.

14. The U.S. Office of Personnel Management ("OPM") funds and oversees the FEHBP, which covers a portion of DME expenditures incurred by federal government employees, retirees, and their families.

15. The U.S. Department of Defense ("DOD") funds and oversees the CHAMPUS and TRICARE programs, which cover a portion of DME expenditures incurred by civilian DOD employees, retirees, and their families.

### *State Plaintiffs*

16. Relators bring this action on behalf of the states of Alaska, California, Colorado, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Montana, Nevada, New Jersey, New Mexico, New York, North Carolina, Oklahoma, Rhode Island, Tennessee, Texas, Vermont, Virginia, and Washington ("the state plaintiffs"). Relators bring this action under the *qui tam* provisions of the following false claims laws of the state plaintiffs: Alaska Stat. Ann. § 09.58.010 *et seq.*; California False Claims Law, Cal. Gov. Code § 12650 *et seq.*; California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq.*; Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5 through 25.5-4-310; Connecticut Gen. Stat. § 4-274 *et seq*; the District of Columbia's False Claims Act, D.C. CODE §§ 2-381.01 *et seq.*; the Delaware False Claims and Reporting Act, 6 Del. C. § 1201 *et seq.*; Florida False Claims Act, Fla. Stat. §§ 68.081-68.09; Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*; Hawaii False Claims Law, HRS § 661-21 *et seq.*; Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/1 *et seq.*; Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et*

*seq.*; Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-1 *et seq.*; Iowa False Claims Act, Iowa Code § 685.1 *et seq.*; Louisiana Qui Tam Action Act, La. R.S. 46:438.1 *et seq.*; Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq.*; Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, § 5A, *et seq.*; Michigan Medicaid False Claims Act, Mich. Comp. Laws Ann. § 400.601, *et seq.*; Minnesota False Claims Act, Minn.Stat. § 15C.01 *et seq.*; Montana False Claims Act, Mont. Code Ann. § 17-8-401 *et seq.*; Nevada Submission of False Claims to State or Local Government Act, Nev. Rev. Stat. Ann. § 357.010 *et seq.*; New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1; New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*; New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*; North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*; Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. tit. 63, § 5053.1 *et seq.*; Rhode Island False Claims Act, R.I. Gen. Laws Ann. § 9-1.1-1 *et seq.*; Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*; Texas False Claims Act, Tex. Hum. Res. Code Ann. § 36.001 *et seq.*; Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*; Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*; and Washington Health Care False Claim Act, Wash. Rev. Code Ann. § 48.80.010 *et seq.*. On behalf of the state plaintiffs, Relators seek recovery for damages caused by the submission of false claims to state-funded health insurance programs, including but not limited to: i) the federal-state Medicaid programs that are jointly funded by the United States and the state plaintiffs; and ii) other state health insurance programs that cover some or all of the costs of DME. Under the California Insurance Frauds Prevent Act and Illinois Insurance Claims Fraud Prevention Act, Relators seek recovery for damages caused by the submission of false claims to private insurers.

**Defendant Lincare**

17.     Lincare Holdings Inc. is one of the nation's largest providers of home respiratory services and certain durable medical equipment, including oxygen therapy, inhalation therapies, and sleep apnea treatment. According to Lincare Holdings Inc.'s press releases, the company operates approximately 1,000 locations throughout the United States, employs approximately 11,000 people, and services over a million patients.  It is headquartered in Clearwater, FL and is a subsidiary of The Linde Group, the largest gases and engineering company in the world, with revenue exceeding 17 billion Euros in 2014.

18.     The remaining named defendants are U.S. subsidiaries owned or controlled by Lincare Holdings Inc. that, on information and belief, participate in Lincare Holdings Inc.'s fraudulent scheme described in this complaint.   In December 2015, Lincare Holdings Inc. announced the acquisition of American HomePatient, Inc., "one of the top five largest diversified home healthcare providers in the United States, with more than 220 locations . . . [that] provide a comprehensive range of services and products in areas including sleep apnea, respiratory care, and nebulizer treatment."  On information and belief, after this acquisition was finalized in 2016 or 2017, Lincare retained the American HomePatient branding but otherwise integrated operations under existing Lincare management.  Together, the complaint refers to all defendants as "Lincare."

19.     Lincare sells and rents machines for respiratory therapy, which are prescribed to patients for a variety of breathing-related diseases and disorders, including but not limited to sleep apnea, chronic obstructive pulmonary disease ("COPD"), and neurological and neuromuscular disorders, among others.  Lincare employs Sales Representatives, who market Lincare's products to doctors and hospitals.  Lincare also employs Respiratory Therapists and nurses as Healthcare Specialists whose regular job is to train and guide patients on how to use

the equipment sold or rented by Lincare. As discussed further below in this complaint, Lincare's fraudulent scheme has diverted Healthcare Specialists to serve as another part of Lincare's sales force for respiratory therapy machines.

## BACKGROUND ON NHV THERAPY

20.     Broadly speaking, there are four major types of machines which assist patients with breathing that are often prescribed for home usage. In increasing order of complexity and cost, they are:

(1) Oxygen-only masks and nose pieces (for example, cannulas that connect to an oxygen source, and provide oxygen-rich air directly to the patient, but that do not assist with breathing);

(2) Continuous Positive Airway Pressure ("CPAP") machines, that (with or without oxygen) deliver a constant pressure of air through a mask to the patient;

(3) Bi-lateral Positive Airway Pressure ("BiPAP") machines, that (with or without oxygen) deliver two different pressures of air through a mask to the patient. Typically, the machine senses when a patient is inhaling or exhaling, and switches pressures according to the patient's breaths; and

(4) Non-Invasive Home Ventilation ("NHV") machines,[1] that (with or without oxygen) deliver pressurized air to the patient. NHV machines are unlike BiPAP and CPAP machines because they assist the patient to breathe by delivering a specific volume of air, while CPAP and BiPAP simply deliver air at one (or two) constant pressures. Lincare supplies NHV machines that are manufactured by two third-party

---

[1] These machines are sometimes called non-invasive ventilation ("NIV") machines.

manufacturers: Trilogy (manufactured by Phillips Respironics) and Astral (manufactured by ResMed).

21.     NHV machines are much more expensive than simpler CPAP and BiPAP machines.  NHV costs approximately $1,320 to $1,560/month for renting one machine.  By comparison, simpler machines rent for approximately $100/month (CPAP) and $430 to $576/month (BiPAP), or may be purchased for approximately $797 (CPAP) or approximately $1,726 (BiPAP).

22.     Furthermore, CPAP and BiPAP machines are classified as "capped rentals," and DME providers such as Lincare receive only 13 months of rental fees before ownership of the machine transfers to the patient.  In contrast, NHV machines are classified as items requiring "frequent and substantial servicing" with rental period limit, *i.e.*, DME providers such as Lincare may receive monthly rental fees indefinitely.

23.     Another difference between NHV and the simpler CPAP and BiPAP machines is that CMS requires a sleep study be performed, prior to approving reimbursement for CPAP and BiPAP machines.  That requirement for a sleep study does not apply to NHV machines.  A sleep study costs time and effort. Among other things, conducting a sleep study requires the patient to travel to a sleep study center for overnight observation, and often to pay for some or all of the service.  The lack of a sleep study requirement made it easier for Lincare to convince doctors to prescribe NHV machines to their patients.  Lincare knew this and took advantage of the lack of sleep study requirement to market NHV machines.

24.     The CMS Office of the Inspector General ("OIG") has identified one NHV billing code—E0464[2]—as being associated with a spike in payments over the last three years.  In a September 2015 advisory, OIG asked:  What caused this spike?  *See* HHS OIG Data Brief, Escalating Medicare Billing for Ventilators Raises Concerns, OEI-12-15-00370 (Sep. 2016).  On information and belief, Lincare is one of three suppliers described (but not named) in that Data Brief, as having exponentially increased the numbers of NHV claims submitted in recent years.  These relators have the answer to OIG's question:  At least at Lincare, fraud explains the increase in payments for this expensive billing code.

## STATUTORY AND REGULATORY BACKGROUND

### False Claims Act

25.     The federal False Claims Act provides:

> [A]ny person who—
>
> (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; …
>
> (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to to pay or transmit money or property to the Government,
>
> is liable to the United States Government . . . .

31 U.S.C. § 3729 (a)(1).

---

[2] As of January 1, 2016, E0464 was discontinued.  NIV machines previously billed to that code were assigned to new billing code E0466.

26.     Federal law and regulations require that Lincare, in order to be reimbursed under Medicare, Medicaid, FEHBP, TRICARE or CHAMPUS, must ensure that its items and services are provided "only when, and to the extent, medically necessary." 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 1004.10.

27.     Lincare was and is required to submit claims for reimbursement using the CMS-1500 form (for any claims submitted by paper to CMS) or the 837 form (for claims submitted electronically). The current version of the CMS-1500 form has been in use since at least February 1, 2012. By signing the form, or using its electronic equivalent, Lincare certified that the NHV ventilators it provided were "medically necessary."

28.     Medicare, Medicaid, FEHBP, TRICARE and CHAMPUS distinguish between NHV therapy and other, less expensive respiratory assistance devices ("RADs"), particularly CPAP and BiPAP machines. Specifically, in order to qualify for the more expensive machine, a patient's condition must be so "severe and life-threatening" that "interruption or failure of respiratory support leads to death."

29.     Lincare knew about this condition of payment. For example, Lincare distributed "NHV sales messaging" for December 2017 acknowledging that, for NHV to be appropriate for a patient, a physician must note on a patient's chart that "interruption of respiratory support could lead to serious harm, i.e., decline in health status, worsening of condition, increase risk of $CO_2$ retention, untimely readmissions, death." In another presentation that Lincare developed for training purposes, Lincare provided a sample physician note that stated, in part: "[T]he patient's current disease state requires the patient to use non-invasive ventilation therapy via the Trilogy 100 in order to effectively decrease work of breathing, improve pulmonary status, and prevent interruption or failure of respiratory support which could lead to death." Finally, another Lincare

document titled "NHV Requirements" listed "[i]nterruption of ventilitory [sic] support could lead to serious harm or death" as "required verbiage" in the patient's chart for NHV.

30.     Despite this knowledge, Lincare instructs its Sales Representatives to sell NHV for all patients with diagnoses of Chronic Respiratory Failure ("CRF") related to Chronic Obstructive Pulmonary Disease ("COPD"), regardless of disease severity.  As described above, Lincare has developed a standard "boilerplate" description for all patients with these diagnoses. Lincare demands that all prescribing physicians include this "boilerplate" in their work orders, regardless of whether this is an accurate description of the patient's condition or not.  If the prescribing physician fails to include the "boilerplate" description developed by Lincare,  then Lincare instructs its Sales Representatives to return the NHV order to the physician and demand that the physician revise the wording.

31.     Lincare has also developed an additional "boilerplate" description for new NHV patients who have previously received BiPAP therapy.  Most of these patients have recently been discharged from the hospital, where they received in-patient BiPAP therapy, and upon discharge are advised to continue BiPAP therapy at home.  Lincare convinces those patients' physicians to switch them from BiPAP to NHV, often without any evidence that BiPAP is insufficient or ineffective.  For these patients, Lincare requires the prescribing physician to make an additional special note in the addendum to the patient's medical record indicating that BiPAP is not effective for the patient.  This note is not true for many of these patients.  Lincare instructs its Sales Representatives to discourage the prescription of less expensive BiPAP and CPAP machines, in favor of the much more expensive NHV machines.  Lincare further instructs its Sales Representatives to point out to doctors that BiPAP and CPAP machines require a "sleep study" of the patient before Medicare or Medicaid will cover this treatment.  A "sleep study"

requires time and effort to coordinate, and additional expense. Therefore, the lack of a "sleep study" requirement, for NHV, is a selling point Lincare uses in order to convince physicians to sign NHV prescriptions.

32.     Medicare, Medicaid, FEHBP, TRICARE and CHAMPUS require that patients be "compliant" with NHV therapy. This is a condition of payment—these government programs will not reimburse the cost of NHV for non-compliant patients.

33.     Patients must use the NHV machine for at least 4 hours a day to be compliant with federal regulations, as interpreted by the DMACs.

34.     Lincare knew that no reimbursement was permitted for non-compliant patients. For example, Lincare made notes in patient records when patient usage of NHV fell below 4 hours per day and encouraged those patients to increase their usage.

35.     Although Lincare knew that no reimbursement was permitted for non-compliant patients, Lincare was also concerned that CMS and private insurers would increase their scrutiny of NHV billing by Lincare and would begin to refuse reimbursement for NHV machines that were not actually being used by patients. That is why Lincare supervisors instructed employees, including relators, to "get as many people signed up on NHV as possible" before CMS began to restrict reimbursement to only those patients who met a minimum usage threshold.

### *The Anti-Kickback Statute*

36.     The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for federally funded medical services, including services provided under the Medicare and Medicaid programs. In relevant part, 42 U.S.C. § 1320a-7b(b) provides:

(2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—

> (A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

> (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

37.     The CMS-1500 form requires Lincare to certify that each "claim . . . complies with all applicable laws . . . including but not limited to the Federal anti-kickback statute."

38.     Compliance with the Anti-Kickback Statute is a condition of payment by federal programs such as Medicare, Medicaid, FEHBP, TRICARE or CHAMPUS.  Violation of the statute can subject the perpetrator to exclusion from participation in federal health care programs and to civil monetary penalties.  42 U.S.C. § 1320a-7a(a)(7); § 1320a-7b(b)(9).

39.     The Anti-Kickback Statute explicitly defines "renumeration" to include "the waiver of coinsurance."  42 U.S.C. § 1320a-7b(b)(9).  The OIG has long held that any exception to the Anti-Kickback Statute's "prohibition against waiving copayments" based on "financial hardship" "must not be used routinely" and may only be used "occasionally to address the special financial needs of a particular patient."  59 Fed. Reg. 65,231, 65,375 (1994).

## THE FRAUDULENT SCHEME

### *NHV Sales*

40.     Beginning in or about January 2011 and continuing through the current time, Lincare has employed a scheme to increase sales and rentals of NHV machines.

41.     Lincare created a "boiler room" sales culture that prioritized NHV sales over patient care and honest billing. Lincare employs Healthcare Specialists ("HCS")—Respiratory Therapists and nurses whose regular job is to visit patients in their homes to assist with their therapy. Lincare directed its Healthcare Specialists to review the medical records of all patients in order to identify patients who might be "converted" to more expensive NHV therapy.

42.     Lincare employees were told to "look within our own walls" to find patients for new NHV orders. Specifically, Lincare employees were told to search within the medical records that Lincare collected for its existing patients and, for instance, target existing oxygen patients with "high liter flow" and all respiratory patients with "recent and frequent hospitalizations." Lincare also looked for patients who reported shortness of breath or difficulty sleeping while laying flat.

43.     Patients currently on less expensive CPAP or BiPAP machines were prime targets for conversion to NHV. Division Manager Karen Schanbacher told employees that, "We don't have a lot of money in business we make on CPAPs." Ms. Schanbacher distributed a handout that listed CPAP as the lowest priority for HCS, as compared to new NHV setups, which were the second highest priority.

44.     If a patient's records revealed a diagnosis that might qualify them for NHV therapy (such as, for example, Chronic Respiratory Failure ("CRF") related to Chronic Obstructive Pulmonary Disease ("COPD")), then the record would be forwarded to a Sales Representative, who would be instructed to approach the patient's doctor to try to convert the patient to NHV. This effort to "convert" the patient to NHV was done in most cases without even informing the patient.

45.     In addition to mining the company's medical records for potential candidates for NHV therapy, Lincare also directed HCSs to complete "CareCheck" assessments of other patients during the HCSs's home visits.    Lincare supervisors instructed employees that CareChecks were the "highest priority" because of their potential to result in patient "conversion" to NHV therapy.

46.     Lincare's CareCheck assessments were targeted at finding symptoms that could match the patient to more of Lincare's products or services, including NHV.    Once the CareCheck was complete, Lincare's Sales Representatives would bring the assessment to the patient's doctor and convince the doctor to "convert" the patient to additional products or services, particularly NHV.

47.     For instance, if a Lincare HCS needed to visit a patient who used oxygen, a nebulizer, or other therapy, the HCS would be instructed to complete a CareCheck to determine if the patient could be a candidate for NHV and/or other Lincare products and services.    The HCSs were instructed not to discuss the proposed "conversion" to NHV with the patients but instead to simply document any symptoms that could be used, by Lincare's Sales Representative, to convince the doctor to change the patient's prescription.    The Sales Representative would then be given the CareCheck assessment to take to the patient's doctor and attempt to convince the doctor to prescribe NHV therapy for the patient. Many of these doctors were general practitioners (*i.e.*, primary care physicians) without expertise in the differences between types of respiratory devices.    Lincare instructed its Sales Representatives to target these general practitioners, which Lincare called "referrals" or "referral sources," rather than the patients' more knowledgeable pulmonologists.

48.     Sales Representatives were told to educate these doctors about respiratory health. For example, November is designated as "COPD Awareness Month." In November 2017, Lincare directed its Sales Representatives to "position yourself as a vital respiratory resource" with all of their "referral sources" (i.e., doctors).

49.     When visiting physicians, Lincare Sales Representatives would bring pre-filled NHV prescriptions for the physician's signature. Lincare pre-filled the diagnosis codes and machine settings on these forms so that only the physician's signature was required.

50.     Furthermore, when Lincare sells a product or service to a new "referral," it encourages the doctor to sign a "blanket" Plan of Treatment form for all of that doctor's patients. Lincare explains that this blanket permission allows Lincare to send a Healthcare Specialist to check on any patient referred by that doctor in the future for a new product or service without needing to bother the doctor for an individual signoff for each patient. However, unbeknownst to many doctors, Lincare also leverages these "blanket" permissions to perform CareCheck assessments on patients to try to sell them additional products or services like NHV.

51.     Lincare set monthly CareCheck goals for each Healthcare Specialist and NHV sales goals for each Sales Representative. At one training meeting, Lincare Division Manager Karen Schanbacher told a group of HCS: "Your CareCheck goal for every single HealthCare Specialist in here is 20 a month. One a day." Ms. Schanbacher went on to state: "Each of you having 20 a month and 40% conversion rate, that is internally contributing to our goals of an 8 to 9 setup rate." In other words, Lincare demanded that its HCSs (whose primary jobs were to provide healthcare services to patients) to "convert" at least four of every ten CareCheck patients to a different Lincare product or service, and thereby to obtain eight to nine orders for new products or services per HCS per month.

52.     At the same meeting, Lincare Area Manager Dan Rosenthal reiterated Ms. Schanbacher's directive to Sales Representatives: "Just to review, one patient a day, what we're looking.  One patient a day to become a Trilogy patient."  (Trilogy is a brand of NHV machine supplied by Lincare.)

53.     The monthly NHV sales goals came directly from Lincare's management.  For instance, each of Lincare's nine regions—Southland, California, Midwest, Midsouth, Great Lakes, Heartland, Northwest, Texas, and Mountain—were required to achieve 50 new NHV orders for September 2017.

54.     Relator Gauch's Area  Manager, Dan Rosenthal, reminded Sales Representatives almost daily about the area's goals for new orders, including NHV.  For instance, Mr. Rosenthal emailed all Sales Representatives in his area on October 12, 2017, telling them that the area had "zero [NHV] for the month!!!!" and that "we need set ups here." The next day, Mr. Rosenthal's manager Ms. Schanbacher emailed all managers in her division about the division's low number of new NHV orders in October:

> We are only ¼ of the way to our monthly and almost ½ of the way through the month.
>
> HOUSTON WE HAVE A PROBLEM!!!
>
> Need every area, every center, every sales rep held accountable!!

On January 10, 2018, Mr. Rosenthal chastised his area for having only two NHV setups so far that month, calling that progress "UGLY, UGLY, UGLY."

55.     Lincare's Sales Representatives were "held accountable" through a "Minimum Performance Standards" policy that all respiratory Sales Representatives were required to sign. Under this policy, Sales Representatives who did not achieve one new NHV order per month would be disciplined, up to and including termination.  Relator Gauch has knowledge of one

Sales Representative who signed up family members who did not desire NHV therapy, in order to meet this monthly quota and keep her job. Even though that family member barely uses the NHV machine, Lincare continues to bill for it.

56.     As an additional motivator, Lincare pitted its centers against each other in contests to see which center could have the most new NHV orders in each quarter. Winners received trophies, recognition, and expensive office dinners with "Senior Management." Ashley Lovell, Lincare's National Product Manager for NHV, kept Lincare employees informed of the status of these competitions. For instance, Ms. Lovell emailed all Sales Representatives, Healthcare Specialists, and Area/Division Managers on October 26, 2017, to distribute NHV "rankings" for September 2017 and congratulate one center on winning the "Clinical Excellence Traveling Trophy for Q3." Greg McCarthy, Lincare's Chief Operating Officer, responded to congratulate the center: "Looking forward to having dinner with everyone in Hattiesburg – well done!"

57.     Lincare also held an "Achievement" competition where the centers with the most growth for the six-month period from July 1 to December 31, 2017, would be awarded a free trip to Orlando, Florida. In October, Ms. Lovell encouraged all centers to "light it up the next three months" when finishing the "race" for the Achievement.

58.     Finally, Lincare encourages its Sales Representatives to give bonuses to other employees in the centers who give them "leads" on potential patients when such leads lead to sales. This bonus program applies to all Lincare products and services, including NHV. As the Sales Representatives are the only employees to receive commissions based on sales, these tips — of cash, gift cards, or other gifts — to Customer Service Representatives, Patient Service Technicians, or Healthcare Specialists came directly from the Sales Representatives, not Lincare.

According to Lincare, these bonuses or tips helped ensure that the whole center had incentive to increase NHV sales.

### Non-Compliant Patients

59.     Many of Lincare's newly converted NHV patients were already receiving a simpler (and cheaper) form of therapy—typically oxygen (administered through a nasal cannula during the day) and CPAP or BiPAP (usually at night). Lincare knew that many of these patients did not require NHV machines and would not comply with their NHV treatment.

60.     NHV treatment is more uncomfortable for most patients than alternative forms of respiratory therapy (oxygen through a nasal cannula or mask; CPAP; or BiPAP). NHV machines are also more complicated to operate than these alternative forms of therapy.

61.     Once a patient was signed up for NHV, Lincare refused to help patients return to simpler therapy or even to return the NHV equipment, even if patients were not using their NHV machines or were using them only occasionally. Instead, Lincare would attempt to "re-educate" patients on the NHV machines.

62.     Lincare knew that many of its NHV patients are and were "non-compliant" (*i.e.*, not using the NHV machines at all, or using them for much less than the 4 hours per day required for reimbursement by CMS). Relators believe that this is the most widespread source of false claims. Lincare knew that patients were not compliant because it periodically had Healthcare Specialists check on these patients after the NHV was installed in the patient's home. The ventilator checks included the collection of internal data from each NHV machine that shows how many hours the machine had been used by the patient.

63.     Lincare's data about patients' usage (and non-usage) of their NHV machines comes in at least two forms: First, machine-generated data, recorded by the machines on

removable memory cards that Lincare's Healthcare Specialists uploaded to Lincare's internal database, and second, progress notes created by Healthcare Specialists after checking up on patients in their homes. Machine-generated data, obtained by Relator Gauch, shows average daily use of far less than 4 hours per day. The machine-generated data also shows the number of days on which the machines were not used at all.

64. However, this first source of data has been knowingly limited or destroyed by Lincare. Lincare's policy, as told to Relators, is *not* to extract the data from the NHV machines, even though many of the prescriptions signed by doctors require Lincare to do so and to submit the information to doctors. Lincare's policy is to extract this data if (and only if) the doctor independently sends a separate instruction (in addition to the prescription), asking for the data.

65. Upon information and belief, Lincare's strong preference for Trilogy NHV machines (manufactured by Respironics) over Astral NHV machines (manufactured by ResMed) is directly related to this policy of suppressing collection of detailed, machine-generated data. A colleague informed Relator Gauch that, because the newer Astral model would allow remote monitoring of a patient's use of the machine directly by the physician, Lincare preferred to stay with the older Trilogy model.[3] According to Relator Gauch's colleague, Lincare does not want to create a record of patient noncompliance. Relator McNeill confirms that her center also had this preference for Trilogy over Astral NHV machines.

66. Even when Lincare did manually extract machine-generated data from Trilogy NHV machines, the data could be wrong. Lincare did not purchase a new machine for each patient, but rather supplied patients with machines from Lincare's existing stock. Because

---

[3] Although Respironics has added remote monitoring capability to the Trilogy NHV machine, many of the machines previously purchased and still used by Lincare do not have this function.

Lincare did not routinely switch the SD card contained in the machine, the new patient's machine-generated data could be contaminated by the previous patient's data. One of Relator Gauch's colleagues acknowledged this was a "compliance issue."

67.     The second source of data on patient's lack of use of NHV machines is the progress notes, which are made by Lincare's respiratory therapists during their visits to the patients. These progress notes (also referred to as "vent check" notes) document the "hours used" of the machines. Many of these documents show zero hours of use or low hours of use, and comparing each vent check to the prior vent check often shows very little change in hours used from the last check. The only reason that Lincare has its Healthcare Specialists check "hours used" despite avoiding downloading the more detailed machine-generated usage data is to monitor the patient's machine for preventative maintenance, which is required every 2 years or 10,000 hours, whichever is sooner..

68.     Both sources of patient data likely overstate the amount of time patients have actually received therapy from the NHV machines. That is because the data (in both sources) typically records the amount of time that the NHV machine has been turned on. Thus if the machine is turned on, these data sources will reflect usage even if the patient was not wearing the mask or using the mouthpiece and thus was not actually receiving any therapy.

69.     Non-compliance indicates that the patients' condition is not so "severe and life-threatening" that "interruption or failure of respiratory support leads to death." Non-compliant patients not only "interrupted" their "respiratory support," they did not use the NHV machine at all, often for days, weeks, even months at a time.

70. From personal observation at their two centers, and from conversations with their colleagues, Relators know that patient non-compliance with NHV machines is extremely common.

71. Lincare severely discouraged "pick up" of any NHV machine, even if the patient was non-compliant and requested that the machine be returned. Relator Gauch was told that no pick ups could occur absent management approval, and her manager, Tina Karban, even forbade pick ups for recently deceased patients: "Not even Death that I don't approve first." Relator McNeill confirms that the management of her center would also require approval before any equipment pick ups, particularly during months when sales were slow.

### *Lincare's Fraud Harmed Patients*

72. Switching patients from their existing therapy to NHV also threatened patient health in three ways: *First,* NHV machines are more complicated and, for some patients, more uncomfortable. Most COPD patients are elderly and vulnerable, are accustomed to their simpler therapy, and have struggled to adapt to the more cumbersome NHV machines. Relators observed some patients routinely forget to bleed in oxygen into their NHV machines before going to sleep at night (a critical step to getting necessary oxygen). The Relators observed other patients, who were unable to tolerate the discomfort, simply refuse to use the machine at night.

73. *Second,* NHV machines automatically deliver a certain volume of air, unlike BiPAP and CPAP machines. That automated volume is dangerous for patients whose lungs fill with liquid during the night. Liquid in the lung reduces the total air volume available. When a constant volume is blown into a reduced space, the lung may be damaged or even burst.

74. *Third*, Lincare's practice of providing doctors with pre-filled NHV prescriptions where the machine settings were not calibrated to each individual patient resulted in at least one patient death while using the NHV machine.

### *Specific Patients for Whom Lincare Submitted False Claims*

75. Lincare knowingly submitted false claims for reimbursement for patients Lincare knew to be non-compliant with their NHV therapy. For example, documents obtained by Relators indicate that Lincare knew the following patients, whose NHV machines were being billed to Medicare, Medicaid, or Tricare, were non-compliant (the patients are identified here by their CMS Health Identification Card "HIC" number unless otherwise specified): 457257093A, 427153099A, and 087330924.

76. Patient 457257093A was placed on NHV on April 25, 2017. Lincare performed three ventilator checks. At the first check on April 28, 2017, Patient 457257093A had used the NHV machine for 7.7 hours. At the second check on June 6, 2017, Patient 457257093A had used the NHV machine for 31.3 hours. At the third check on September 21, 2017, Patient 457257093A had used the NHV machine for 50.8 hours. The Healthcare Specialist noted discussions with the patient on "using vent at least 4 hours daily" and encouraging the patient to increase usage "to get benefit from vent." Lincare knew that Patient 457257093A was non-compliant with NHV therapy but continued to bill Medicare for the machine.

77. Patient 427153099A was placed on NHV on February 6, 2015. Lincare performed eleven ventilator checks:

March 2, 2015: 0 hours

April 28, 2015: 74.8 hours

June 9, 2015: 92 hours

    August 27, 2015: 118.7 hours

    February 25, 2016: 162.6 hours

    March 25, 2016: 169.8 hours

    May 25, 2016: 216.5 hours

    January 24, 2017: 443.2 hours

    March 24, 2017: 473.4 hours

    August 22, 2017: 533.2 hours

    November 8, 2017: 542.5 hours

The Healthcare Specialists who performed these checks noted that the patient was "not using Trilogy very often" and that they "[e]ncouraged him to use at least 4 hrs / night." A download of Patient 427153099A's machine data in November 2017 revealed that over the lifetime of the machine, the patient did not use the machine *at all* 67% of the days, and the patient used the machine for less than 4 hours daily for 98.3% of the days. Yet for over two-and-a-half years of non-compliance, Lincare continued to bill Medicare for this patient's NHV machine. Indeed, in November 2017, Lincare replaced Patient 427153099A's barely used NHV machine with a new one, noting that the original machine needed to be "exchanged" for preventative maintenance.

    78.    Patient 087330924 was placed on NHV on August 21, 2015. Lincare performed ten ventilator checks:

    August 22, 2015: 14.4 hours

    November 3, 2015: 424.7 hours

    January 12, 2016: 683 hours

    March 24, 2016: 849.2 hours

    May 25, 2016: 917.6 hours

    January 26, 2017: 1134.4 hours

April 19, 2017: 1180.8 hours

June 23, 2017: 1193.6 hours

July 31, 2017: 1218.5 hours

November 10, 2017: 1266.7 hours

The Healthcare Specialists who performed these checks began noticing in May 2016 that the patient was not using the NHV machine regularly and "encouraged [the patient] to use Trilogy more." A download of Patient 087330924's machine data in November 2017 revealed that over the lifetime of the machine, the patient did not use the machine *at all* 60% of the days, and the patient used the machine for less than 4 hours daily for 83.3% of the days. Yet despite Patient 087330924's prolonged non-compliance, Lincare continued to bill Medicare for this patient's NHV machine.

79.     Lincare has deceived Medicare, Medicaid, FEHBP, TRICARE and CHAMPUS by knowingly submitting false claims for reimbursement for NHV rentals and purchases, for which Lincare was not entitled to reimbursement (and Lincare knew it was not so entitled).

80.     Lincare's claims were false because the patients were non-compliant (thereby violating both the "life threatening" and the "4-hour compliance" conditions of payment).

### *Routine Waiver of Copayments*

81.     NHV patients are required to make a monthly copayments on their devices, unless they have secondary insurance that would cover the copayment. To encourage patients to agree to NHV despite the high monthly copayment, Lincare routinely instructs patients to apply for financial hardship waivers that would reduce or eliminate the patient's responsibility for copayments for the NHV machine. Lincare routinely granted these financial hardship waiver applications. Relator McNeill recalls that her manager once stated, "It doesn't even go through a

process, we just sign off on it," when told of a patient who worried about having "too much money" to qualify for financial assistance.

82.     This scheme benefitted Lincare because Lincare knew that these patients, if required to make the copayments personally, would have complained and rejected the NHV machines.  By waiving the "co-pay" requirement, Lincare knew that it would avoid those patient complaints while continuing to make money by billing Medicare, Medicaid, FEHBP, TRICARE and CHAMPUS.

83.     Lincare did not offer financial assistance to patients who had secondary insurance that would cover their copayment, as the patient would have no reason to complain about the cost of the NHV machine.

84.     Long-standing guidance from CMS indicates that routine waivers of co-payments constitutes a kickback: "Routine waiver of . . . copayments by charge-based . . . suppliers is unlawful because it results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare." 59 Fed. Reg. 65,231, 65,374 (1994).

85.     Lincare violated the Anti-Kickback Statute by paying patients renumeration in the form of a "waiver of coinsurance" and/or waiver of copayments on a routine basis.

86.     At least one DMAC has conducted audits of NIV claims submitted by DME providers under billing codes E0464 and E0466 and found error rates of 100% and 76%, respectively, for reasons including failure of "justification for medical need" because the NIV was not used to treat "life-threatening conditions where interruption of respiratory support would quickly lead to serious harm or death."  If the United States had known that Lincare was submitting claims for NIV machines used by non-compliant patients or NIV machines associated

with unlawful kickbacks, the United States would not have paid Lincare's claims. Similarly, Lincare's concealment of these false practices were material to the United States' failure to require Lincare to correct overpayments for NIV already received.

## COUNT ONE

(Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*)

87.     This is a civil action by Relators, acting on behalf of and in the name of the United States, against the Defendants under the False Claims Act.

88.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

89.     Lincare has knowingly presented or has caused to be presented false or fraudulent claims for payment by the United States, in violation of 31 U.S.C. § 3729(a)(1)(A).

90.     Lincare has knowingly made or used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(1)(B).

91.     Lincare has knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States, in violation of 31 U.S.C. § 3729(a)(1)(G).

92.     Because of the Defendant's conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

## COUNT TWO

(Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*,
and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b))

93.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

94.    Lincare has knowingly and willfully offered to pay and paid renumeration to arrange for the leasing of an item for which payment was made under a federal health care program, in violation of 42 U.S.C. § 1320a-7b(b)(2).

95.    Lincare has knowingly presented or has caused to be presented false or fraudulent claims for payment by the United States, when it submitted or caused the submission of claims that were impermissibly linked to illegal renumerations under the Anti-Kickback Statute.

96.    Because of the Defendant's conduct set forth in this Count, the United States has suffered actual damages in the hundreds of millions of dollars, with the exact amount to be determined at trial.

## COUNT THREE

(Alaska Medical Assistance False Claim and Reporting Act,
Alaska Stat. Ann. § 09.58.010 *et seq.*)

97.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

98.    Based on the foregoing allegations, the Defendants are liable under Alaska Stat. Ann. § 09.58.110.

## COUNT FOUR

(California False Claims Law, Cal. Gov. Code § 12650 *et seq.*)

99.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

100.     Based on the foregoing allegations, the Defendants are liable under Cal. Gov. Code § 12650 *et seq.*

## COUNT FIVE

(California Insurance Frauds Prevention Act, Cal. Ins. Code § 1871 *et seq.*)

101.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

102.     Based on the foregoing allegations, the Defendants are liable under Cal. Ins. Code § 1871 *et seq.*

## COUNT SIX

(Colorado Medicaid False Claims Act, Col. Rev. Stat. 25.5-4-303.5 through 25.5-4-310)

103.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

104.     Based on the foregoing allegations, the Defendants are liable under Col. Rev. Stat. 25.5-4-303.5 *et seq.*

## COUNT SEVEN

(Connecticut False Claims Act, Conn. Gen. Stat. § 4-274 *et seq.*)

105.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

106. Based on the foregoing allegations, the Defendants are liable under Conn. Gen. Stat. § 4-274 *et seq.*

## COUNT EIGHT

(Delaware False Claims & Reporting Act, 6 Del. Code § 1201 *et seq.*)

107. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

108. Based on the foregoing allegations, the Defendants are liable under the Delaware False Claims & Reporting Act, 6 Del. Code § 1201 *et seq.*

## COUNT NINE

(District of Columbia False Claims Act, D.C. Code § 2-381.01 *et seq.*)

109. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

110. Based on the foregoing allegations, the Defendants are liable under D.C. Code § 2-308.01 *et seq.*

## COUNT TEN

(Florida False Claims Act, Fla. Stat. § 68.081 *et seq.*)

111. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

112. Based on the foregoing allegations, the Defendants are liable under Fla. Stat. § 68.081 *et seq.*

## COUNT ELEVEN

(Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*)

113.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

114.    Based on the foregoing allegations, the Defendants are liable under the Georgia State False Medicaid Claims Act, Ga. Code Ann. § 49-4-168, *et seq.*

## COUNT TWELVE

(Hawaii False Claims Law, HRS § 661-21 *et seq.*)

115.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

116.    Based on the foregoing allegations, the Defendants are liable under the Hawaii False Claims Law, HRS § 661-21 *et seq.*

## COUNT THIRTEEN

(Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/1 *et seq.*)

117.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

118.    Based on the foregoing allegations, the Defendants are liable under the Illinois Whistleblower Reward & Protection Act, 740 ILCS 175/1 *et seq.*

## COUNT FOURTEEN

(Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*)

119.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

120.    Based on the foregoing allegations, the Defendants are liable under the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.*

## COUNT FIFTEEN

(Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5.-1 *et seq.* (2005))

121.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

122.    Based on the foregoing allegations, the Defendants are liable under the Indiana False Claims & Whistleblower Protection Law, Ind. Code § 5-11-5.5-1 *et seq.*

## COUNT SIXTEEN

(Iowa False Claims Act, Iowa Code § 685.1 *et seq.*)

123.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

124.    Based on the foregoing allegations, the Defendants are liable under Iowa Code § 685.1 *et seq.*

## COUNT SEVENTEEN

(La. R.S. 46:438.1 *et seq.* )

125.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

126.    Based on the foregoing allegations, the Defendants are liable under La. R.S. 46:438.1 *et seq.*

## COUNT EIGHTEEN

(Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq.*)

127.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

128.     Based on the foregoing allegations, the Defendants are liable under the Maryland False Health Claims Act, Md. Code Ann. Health-Gen. § 2-601 *et seq.*

## COUNT NINETEEN

(Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, § 5A *et seq.*)

129.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

130.     Based on the foregoing allegations, the Defendants are liable under Massachusetts False Claims Law, Mass. Gen. Laws Ann. ch. 12, § 5A *et seq.*

## COUNT TWENTY

(Michigan Medicaid False Claims Act, Mich. Comp. Laws Ann. § 400.601, *et seq.*)

131.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

132.     Based on the foregoing allegations, the Defendants are liable under the Michigan Medicaid False Claims Act, Mich. Comp. Laws Ann. § 400.601, *et seq.*

## COUNT TWENTY-ONE

(Minnesota False Claims Act, Minn. Stat. § 15C.01 *et seq.*)

133.     Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

134.    Based on the foregoing allegations, the Defendants are liable under Minn. Stat. § 15C.01 *et seq.*

## COUNT TWENTY-TWO

(Montana False Claims Act, Mont. Code Ann. § 17-8-401)

135.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

136.    Based on the foregoing allegations, the Defendants are liable under Mont. Code Ann. § 17-8-401.

## COUNT TWENTY-THREE

(Nevada Submission of False Claims to State or Local Government Act,
Nev. Rev. Stat. Ann. § 357.010 *et seq.*)

137.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

138.    Based on the foregoing allegations, the Defendants are liable under Nev. Rev. Stat. Ann. § 357.010 *et seq.*

## COUNT TWENTY-FOUR

(New Jersey False Claims Act, N.J. Stat. Ann. § 2A:32C-1)

139.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

140.    Based on the foregoing allegations, the Defendants are liable under N.J. Stat. Ann. § 2A:32C-1.

### COUNT TWENTY-FIVE

(New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*)

141.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

142.    Based on the foregoing allegations, the Defendants are liable under the New Mexico Medicaid False Claims Act, N.M. Stat. Ann. § 27-14-1 *et seq.*

### COUNT TWENTY-SIX

(New York False Claims Act, N.Y. State Fin. Law § 187 *et seq.*)

143.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

144.    Based on the foregoing allegations, the Defendants are liable under NY State Fin. Law, Art. 13.

### COUNT TWENTY-SEVEN

(North Carolina False Claims Act, N.C. Gen. Stat. Ann. § 1-605 *et seq.*)

145.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

146.    Based on the foregoing allegations, the Defendants are liable under N.C. Gen. Stat. Ann. § 1-605 *et seq.*

### COUNT TWENTY-EIGHT

(Oklahoma Medicaid False Claims Act, Okla. Stat. Ann. tit. 63, § 5053.1 *et seq.*)

147.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

148. Based on the foregoing allegations, the Defendants are liable under Okla. Stat. Ann. tit. 63, § 5053.1 *et seq.*

## COUNT TWENTY-NINE

(Rhode Island False Claims Act, R.I. Gen. Laws § 9-1.1-1 *et seq.* )

149. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

150. Based on the foregoing allegations, the Defendants are liable under R.I. Gen. Laws § 9-1.1-1 *et seq.*

## COUNT THIRTY

(Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*)

151. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

152. Based on the foregoing allegations, the Defendants are liable under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

## COUNT THIRTY-ONE

(Texas False Claims Act, Texas Human Resources Code, § 36.001 *et seq.*)

153. Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

154. Based on the foregoing allegations, the Defendants are liable under the Texas False Claims Act, Tex. Hum. Res. Code Ann. § 36.001, *et seq.*

### COUNT THIRTY-TWO

(Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*)

155.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

156.    Based on the foregoing allegations, the Defendants are liable under the Vermont False Claims Act, Vt. Stat. Ann. tit. 32, § 630 *et seq.*

### COUNT THIRTY-THREE

(Virginia Fraud Against Taxpayers Act, Va. Code Ann. § 8.01-216.1 *et seq.*)

157.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

158.    Based on the foregoing allegations, the Defendants are liable under Va. Code Ann. § 8.01-216.1 *et seq.*

### COUNT THIRTY-FOUR

(Washington Health Care False Claim Act, Wash. Rev. Code Ann. § 48.80.010 *et seq.*)

159.    Relators reallege and incorporate by reference paragraphs 1 through 86 as though fully set forth herein.

160.    Based on the foregoing allegations, the Defendants are liable under Wash. Rev. Code Ann. § 48.80.010 *et seq.*

### PRAYER FOR RELIEF

WHEREFORE, Relators pray for the following relief:

161.    On Counts 1 through 34, judgment for the United States or the State, as applicable, against Defendants in an amount equal to three times the damages the federal or state plaintiff

government, respectively, has sustained because of the Defendants' actions, plus a civil penalty of $11,000 (or such other maximum amount as may be provided by law) for each violation;

162.    On Counts 1 through 34, an award to Relators of the maximum allowed under the federal or state law under which suit is brought by the Relators on behalf of the federal or state plaintiff, respectively;

163.    Against the Defendants, attorneys' fees, expenses and costs of suit; and

164.    Such other and further relief as the Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs request that this matter be tried before a jury.

DATED: January 29, 2018                        Respectfully submitted,

BY: _____

Arun Subramanian (AS2096)
Steven M. Shepard (SS4146)
Geng Chen (GC2733)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, Fl. 32
New York, New York 10019
Telephone: (212) 336-8330
Facsimile: (212) 336-8340
asubramanian@susmangodfrey.com
sshepard@susmangodfrey.com
gchen@susmangodfrey.com

Kirk Chapman (KEC 7371)
Brian Krauss
Brian Krauss Law Firm
55 Berry Street
Brooklyn, NY 11249
Telephone: (800) 553-0710
kchapman@whistleblowersinternational.com
bkrauss@whistleblowersinternational.com

COUNSEL FOR RELATORS